Good morning, Your Honors. May it please the Court, Michael Garrett on behalf of DIRECTV. At this time, and with the permission of the Court, I would like to reserve two minutes for rebuttal. We wish you luck, as you've seen from the previous ones. We sometimes ask a lot of questions. I will try to be mindful of the clock. Your Honors, I received the Court's order last week, and I think I would be remiss if I didn't address the Court of Appeal's testimony at the outset. And in that case, the Court of Appeal held that expert testimony from psychiatrists was quote-unquote properly considered in determining whether the acts in question in that case, namely a conversation between a psychiatrist and another psychiatrist, were made in the course of rendering professional services in the practice of psychiatry as was required by that policy. And in so holding, the Court of Appeal stated that the meaning of language in a contract involving a psychiatrist is determined by the trade usage of that language. And the rationale for this rule is simple, and it's the same rationale that was used by the Court in Wolf v. Superior Court, which was cited in DIRECTV's brief. And the rationale is that it gives effects to the words used in the contract as intended by the parties, because a person who contracts in a specific industry is held to have dealt in accordance with the industry's known usages of trade. And by applying this rule to insurers that issue insurance policies in a particular industry, Getty's is following a precedent that has been in place for hundreds of years, is codified in the California Insurance Code, is recognized by leading insurance law treatises, and in fact is consistent with the Court of Appeal's more recent decision in Wolf v. Superior Court and the Supreme Judicial Court of Massachusetts' decision in City Fuel v. National Fire Insurance Company. But talk to me a little bit about this, because I understand Getty's applied it to a professional insurance company. But here, I'm just trying to figure out how we can ascribe to the factory mutual the knowledge and understanding of this industry term when it involved an usage, the mutual expertise and understanding of the parties. No, Your Honor, I would disagree. I think Getty's clearly indicates that the policy in that case was written by the insurance company for psychiatrists, professional liability. The insurance company is not in the business of psychiatry. The insured is. Similarly, here, factory mutual wrote a policy for DIRECTV to insure its supply chain risk. But that certainly is the origin of this. I mean, that it originated when people were contracting within the same industry, and it was somewhat of a later flourish to say that if you were insuring such a business, you were deemed to understand the business you were insuring. Yeah, Your Honor, yes, I don't dispute that, that the original intent behind the usage of trade was that the parties are both engaged in that industry. But applying it to insurance companies does no injustice because again, the insurance company is in a peculiar situation as opposed to two parties that are simply contracting at arm's length. The insurance company has an opportunity as a practical matter to engage in underwriting. They can understand DIRECTV's supply chain. They can inquire into the trade usage of particular terms. But before I read your briefs, I thought that everybody knew what a direct supplier was. You know, when I look at Getty's and we have professional services, psychiatric professional services, and we also have an insurance company that was taking an extraordinarily narrow view of what they were, the psychiatric professional services may obviously be more expansive than what this insurance company wanted it to be. But a direct supplier isn't a term that just exists within the business that DIRECTV is in. A direct supplier exists with respect to almost all types of manufacturers or people that buy things from other people. And it was one of those terms that, as I said, I thought we all knew what it meant until I found out that this expert said it meant something different in the business that DIRECTV was in. So can we really take Getty's and expand it to something, such a more common term? I would submit that you can, Your Honor. And direct supplier, while it may seem too common terms, has to be interpreted in the context in which this claim arose and in the context in which the policy was issued. And in this And there is, again, no injustice done if we apply the trade usage of those terms to the policy here. And I would point out that the factory mutual's understanding of the supply chain industry is expressed on the face of the policy itself. This is not a party that's coming to this with no understanding of the supply chain or what it's insuring. In fact, the very clause that we're interpreting today includes supply chain industry terms. It's not just direct supplier. It's direct supplier, contract manufacturer, and contract service provider. Factory mutual admits that contract manufacturer and contract service provider are supply chain terms. Those are terms used in the industry. It necessarily follows that it's at the very least reasonable that direct supplier would be interpreted in that same way. Also, as sort of an overlay of what I think of as a peculiarity of California law, which is that extrinsic evidence can be admitted even if a contract appears unambiguous, to create an ambiguity, which is certainly not the rule in every state, but it seems to be in California. It's certainly not, Your Honor. But it is here. And Wolf v. Superior Court highlights that, which is when you have gross receipts, maybe that means something clear. Maybe it's like direct supplier that we all understand what gross receipts means. But in that particular industry, just like here in the supply chain industry, extrinsic evidence is admitted to expose a latent ambiguity in the contract. And that's precisely, at the very least, what's at issue here. In my view, the trade usage evidence really has two applications. There's one, which is whether or not it's strictly interpreted under the trade usage, and therefore, direct supplier means what we've submitted expert evidence on. Or at the very least, it's... It's a jury question. Excuse me? Doesn't it create a jury question? Because yours is not the only permissible interpretation under what is in the record. That's correct, Your Honor. If the trade usage evidence is considered, and factory mutual also, although not through expert testimony, but through reference to some books written by a professor, and again, we had evidentiary issues with that, but I'll set that aside. Those, at best, would create competing interpretations of what direct supplier is in the industry, and would necessarily require reversal of the district court's order. But I would like to, since it's been raised, address the evidence that has been submitted by factory mutual regarding the meaning of direct supplier in the industry. And I would note that direct supplier, the term, does not appear anywhere in that evidence. Instead, they focus on first tier and second tier suppliers. And factory mutual has focused a great deal on this language, but it's important to note that that language does not appear in the policy. First tier and second tier is not in the policy. But that's really not, before us, as Judge Graber just mentioned, the most favorable outcome to Direct TV here is that you go back to fight with the fact finder and present your evidence to the fact finder, and the fact finder will decide what direct supplier means in the contract based on whatever competing evidence there is. Yes, Your Honor, that's one outcome under the trade usage prong. But again, there's multiple arguments. So if trade usage is, in fact, applied here and the evidence is considered as extrinsic evidence of that trade usage, then yes, that would be the outcome. But there are other ways in which the decision can be reversed. For example, one of the questions before the court, separate and apart from the trade usage, is whether Direct TV is reasonable in its interpretation that Western Digital is a direct supplier to Direct TV under the policy. And the one thing that I want to note on this point is that it's not a contest between the reasonableness of the parties' respective interpretations, even if, of course, Direct TV thinks its interpretation is controlling. In order for factory mutual to prevail, it must show that its interpretation is the only reasonable interpretation. And Direct TV submits that based on the lack of guidance. Well, you mean for them to prevail now as distinct from if there's a factual fight later? Because if there are competing inferences that can be Correct, Your Honor. On the trade usage point, that would be correct. And so you're arguing that direct supplier, well, if direct supplier has a plain meaning that we don't look to extrinsic evidence, in my view, the and not going through a third party for further processing. So I'm not really sure I understand the point that you're trying to make. Are you going back to plain meaning right now? Is that what you were doing? Or were you saying, arguing within the context of trade usage? I was not arguing within the context of trade usage. I was suggesting that separate and apart from the trade usage, which is one outcome, is that the trade usage is applicable, and then it's a fact question as to what is the trade usage in the industry. That is one outcome. But even if the trade usage is not applied, I would say. I think you're on thin ice from my perspective. I appreciate the candor, Your Honor. Just speaking for myself. Let me ask you, should we certify this question to the California Supreme Court? Your Honor, I hadn't considered that, but I think it is certainly a question you're referring to. It's certainly an issue that I think is important when it comes to interpreting insurance policies, but I think it is an issue that can be decided based on the authority that has been presented by the parties, as well as the authority noted by the court, which would be the Gettys versus Tri-State. I think that's enough for us to kind of predict how California would come out. I think it is when you combine it with the contractual rules set forth in Wolf v. Superior Court, as well as the long-standing history that parties that contract in a specific industry are deemed to have contracted with the usage of trade in that industry. The only real difference is that this is an insurance company contracting in the industry. But to suggest that that is somehow different from two parties in the industry seems to me to be not a very critical distinction. They are insuring that industry, and therefore, presuming that they understand the usage of trade in that industry is not a significant leap. But Factory Mutual you concede was not a member of the trade industry? Not a member of the supply chain industry. That's correct, Your Honor. I would concede that other than as an insurer of that industry. But it's not Your Honor, I see that my time is almost up, so I'll reserve the remainder of my time for a moment. You may do so. Thank you. May it please the Court, good morning. My name is Scott Johnson. I represent Factory Mutual Insurance Company. I want to address the relevancy of the Geddes case supports the District Court's grant of summary judgment in this case. Why is that? Well, the policy in Geddes, unlike the policy that Factory Mutual issued to DIRECTV, ensured a specified profession or trade, namely, psychiatrists. In fact, the Court noted it was denominated psychiatrist professional liability policy. And that was key to the Court's holding that trade usage could be used. It said, page 184 of the Cal Reporter, the subject policy was written by defendant for and sold to psychiatrists. Both parties to the contract intended the meaning of the language used to And the key was because the policy specifically insured psychiatrists. Interestingly, Geddes has been cited in only one published California opinion in the 49 years it's been in the books. And that was, it's Englewood Radiology versus Hospital Shared Services, 266, Cal Reporter, 501, it's a 1989 decision. And in describing Geddes, it said this, at page 502, in construing the terms of a professional liability policy, we look to those ordinary and normal use, to their ordinary and normal use in that profession. Right, but it was another medical case, so they had no occasion to think about it in a broader context. But here the insurance policy talks about supply chain specifically. And there's, I'm looking at one page where it talks about supply chain time element coverage extensions. So even though it's not a profession, it's a particularized business, why wouldn't the same principle apply that if you're looking at a or you're looking at some other industry, why wouldn't the same general principle apply that trade usage can be relevant? Well, again, in Geddes as well as in Englewood, there's a professional liability policy issued to a particular profession. The factory mutual policy is not that type of a policy. It's a general application policy issued to many different types of insurers in many different types of industries. It's not specific. It does not say electronic supply chain industry policy. The words electronic industry do not appear anywhere in the policy. Well, supply chain does. Supply chain does, but then the policy then would have a different interpretation. The words direct supplier would have a different interpretation depending on what the insured business is. But so why, what's irrational about that? If you insure a psychiatrist, you insure the cattle rancher, you insure an electronics industry, why wouldn't you expect that the terms, that similar terms might have a different meaning in each of those industries? Well, two reasons. Number one, it alters the plain and ordinary meaning of the contract. And that's one of the points that the court in Geddes. Yes, but how do you get around this weird, to me, odd idea that Wolf talks about that even if a contract appears to be unambiguous, extrinsic evidence can be introduced that can uncover or create an ambiguity. So even though it appears to be unambiguous when you look at it, that evidence can be introduced that makes it unclear. And isn't that exactly what happened here? It's not. In fact, the case that the court in Geddes relied on is a Supreme Court decision that the court in Wolf also cited. And it is the Ermolief, I'll spell that, E-R-M-O-L-I-E-F-F versus RKO Radio Pictures, Inc. 122 Pacific Second 3, 1942. That case was cited in support of the holding in Geddes. It's also cited as support of the holding in the Wolf case. And there, the court said at page six of the opinion, the correct rule with reference to the admissibility of evidence as to trade usage under the circumstances here presented is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular, or legal meaning, as the case may be, yet if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and here's the key language, and both parties are engaged in that trade, the parties to the contract are deemed to have used them according to their different and peculiar sense. That's right, and that's the conversation I was having with opposing counsel. That is the origin of the trade usage doctrine, but it has been widely applied to insurers of a particular trade, which is what made Geddes relevant. It expands it from two electronics companies or two cattle ranchers to that industry and an insurer of that industry. There's one missing step there, and that's subsequent cases to that. Ermolov, our Ermolov case, subsequent California Supreme Court cases have said, while you may not be in the same industry, you have to have knowledge. There has to be knowledge of... But isn't there a general principle of insurance law that insurers are deemed to have knowledge of the industry that they have chosen to insure because before writing a policy, they have the opportunity to investigate and obtain the knowledge about that industry, and if they didn't, the insurance company kind of does that to its detriment if it does not obtain the knowledge. So do they actually have to have actual knowledge, or are they deemed to have the knowledge based on principles of insurance laws and the opportunity of the insurer to investigate and know its risk before it writes the policy? Based on Supreme Court authority, you have to have knowledge, or the trade usage has to be common knowledge. And there's no evidence that Factory Mutual had knowledge of the trade usage in the electronic supply chain industry, and it's certainly not common knowledge. There's no evidence of that. The principle that you're referring to, Judge Bolton, I believe is Insurance Code 335B, having presumed knowledge of general usages of trade. That statute's been around for a long time. There's not been a single California case that has interpreted that statute to mean that the insurance company is bound by trade usage in its insurance industry. Except that seems to be the principle underlying Gettys, because clearly the insurance company was not a psychiatrist. I mean, so it at least implicitly adopts a fairly relatively universal concept that when an insurance company insures a particular trade, business, profession, or industry, it's deemed to know what it's getting itself into. No court has ever held that. No California court has ever held that. And the district court here pointed out that Insurance Code 335B is referring to the insurance industry. Right. That's why I said I'm not really thinking about the statute. I'm sort of saying there are general principles that are supported by case law elsewhere. Well, I think, you know, again, the difference between our case and Gettys is that policy was specifically denominated psychiatrist professional liability policy. We do not have a policy specifically denominated electronics supply chain industry policy. If we did, maybe you have a good point, but we do not have that type of a policy. We have a generic policy applicable to any number of insureds, not just direct TV. Any number of insureds that have supply chains, because there is specific supply chain language in this policy. It was contemplated not only that Factory Mutual was insuring direct TV for business interruption, but also others in the supply chain. Correct. And that's why they use the words direct supplier. But that's not a standard, ordinary, just general liability, insure the risks, insure business interruption policy. This was specific to a company that relied on a supply chain. Well, that's a standard provision in the policy form. It's not drafted specifically for direct TV. There's certainly no evidence of that. And keep in mind, one of the things about that particular provision, there's testimony in the record from the underwriter that the standard form includes the word indirect as well as direct for supplier. And they specifically eliminated the word indirect. So the only coverage being provided to direct TV was for direct supplier. When you say they, are you referring to direct TV and Factory Mutual in a negotiation, or is they just Factory Mutual? It's they, meaning the Factory Mutual underwriters. If we do accept that direct TV can introduce this trade uses, is there any reason not to accept or find that the expert declaration is insufficient? Well, in our view, it's insufficient because they have not established that Factory Mutual had the knowledge, for one thing. And I don't think there's been any establishment that this is a widespread, longstanding trade uses as they've alleged. You know, they call this a customer-controlled supplier. I forget the exact words. But those words appear nowhere in any particular case. They appear nowhere in any kind of a learned treatise or publication. You can Google those words and you will not find anything on the Internet. This is something that was created by this expert to try to get insurance coverage for direct TV because they did not fit within the plain and ordinary meaning of direct supplier. But we do know that in a manufacturing operation, sometimes you have your supplier the option to buy their parts from wherever they want, as long as they meet a certain specification. Or you have the situation that you have here where the company you hired to manufacture something for you is limited to buying their parts from specific manufacturers or even a specific manufacturer. And so it would seem that the possibility exists that in that case where you have limited them, that insurance company might well want to investigate that because if that single source or double source in this case has a problem, then that is going to interrupt the supply chain, unlike a situation where your manufacturer or supplier can buy from whoever or whatever company they want. I understand your point. And, you know, the intent of the parties and the rule in California is it's the intent at the time of contracting that governs. This policy is a 2011 policy. None of those facts were ever shared with Factory Mutual at the time of contracting. But was it the responsibility of the underwriters to make themselves aware of the risk that they were insuring? And I think they did. I mean, they did whatever they had to do to satisfy themselves of whatever risk they wanted to insure. And one of the things they did as part of the underwriting is no coverage for indirect suppliers. It's only going to be direct. Whatever that means. Well, I think direct has a very plain and ordinary meaning. It means without intervention or intermediary. That circles back to the principle that in California you can introduce evidence to create an ambiguity. I mean, that's the very issue in the case. Well, the evidence that they've submitted, though, is trade usage evidence. Right. And there's no knowledge or no evidence that Factory Mutual had any knowledge of that trade usage. Right, which goes back to the question whether the principle applies that an insurance company is deemed to understand the trade usage of the industries that it chooses to insure. And I agree with you. And no California court has ever held that. Well, Getty. That's because that policy was specifically for a specified profession. Well, that's the distinction you'd like to raise. But it is a California appellate case that holds an insurance company to a trade usage of its insured, even though it's not in the same business. So it's at least in general supportive of that principle. Your Honors, I'm about out of time, but I would ask, you know, the Getty's case was not cited in the district court, nor was it cited on appeal. It's never been briefed. We would request the opportunity to provide a supplemental brief addressing the Getty's case. We'll consider it. But that's one reason we issued the order for you to discuss it today, both of you. Well, I think we discussed it some, but I think we could discuss it further if we had more time. But in closing, as the district court found, Western Digital here was not a direct supplier under any reasonable interpretation of those words, as they're understood with their plain and ordinary meaning. Western Digital sold nothing to DirecTV. DirecTV paid not even a penny to Western Digital. The Western Digital hard drives went to DirecTV only after Western Digital sold them to third parties who installed them in set-top boxes and then sold those finished set-top boxes to DirecTV. So therefore, we respectfully request that the court affirm the district court vote. Thank you, counsel. Mr. Garrett, you have a couple of minutes remaining. Thank you, Your Honor. Just a couple of points on rebuttal. One was Factory Mutual's representation. This policy was not drafted particularly for DirecTV. If you'll notice, they did submit evidence to suggest that that was, in fact, the case, that they altered their standard form to only provide coverage for direct suppliers for DirecTV. So the notion that there's a distinction between the title of the policy as opposed to who the policy is issued to or the risk the policy insures is simply a false distinction. The policy here insured supply chain risk. But the change does suggest that they were trying to cut off whatever indirect supply means. Absolutely, Your Honor. They did not want to cover indirect suppliers. We don't dispute that. But notably, Factory Mutual didn't offer any evidence to show that it ever communicated its unwillingness to provide coverage for indirect suppliers or, more importantly, whether or not it considered Western Digital to be an indirect supplier. And I take it they didn't issue a policy form that had the term indirect supplier X'd out. No, Your Honor. There's no evidence to establish that they deliberately declined coverage or communicated that intent to DirecTV that they were not providing coverage for indirect suppliers. And to everyone's detriment, there's no definition in the policy. There is not. There is not, Your Honor. There is no definition of direct supplier. And I think that goes to a concern raised by the District Court and raised by Factory Mutual as well, which is that this could have multiple interpretations of direct supplier if we issue this policy to multiple insurers. Again, they issued it to DirecTV. That's the inquiry here. But there's an easy way to remedy that. You could define direct supplier, or you could not provide that specific type of coverage, or you can specifically schedule locations that you include as the contingent time element locations instead of simply eliminating it to direct supplier. So there are options, but Factory Mutual did none of those things, and therefore it's bound by the trade usage in the DirecTV's industry. Thank you, counsel. The case just argued is submitted, and we appreciate the helpful arguments from both of you. We stand adjourned for this morning's session. All rise.
judges: Graber, Murguia, Bolton